<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NICHOLAS COSMAS, | Civ. No. 06-1300 (GEB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

<u>**BROWN, Chief Judge**</u>

This matter comes before the Court upon the appeal of plaintiff Nicholas Cosmas ("Cosmas" or "Plaintiff") from the Commissioner of Social Security's ("Commissioner") final decision that Plaintiff was not entitled to disability insurance benefits under the Social Security Act ("the Act"). The Court, exercising jurisdiction pursuant to 42 U.S.C. § 405(g), and having considered the parties' submissions without oral argument pursuant to Federal Rules of Civil Procedure Rule 78, will affirm the Commissioner's decision and deny Plaintiff's appeal.

**I.   BACKGROUND**

  **A.   Procedural History**

Mr. Cosmas filed an application for Disability Insurance Benefits on December 20, 2002. (Administrative Record ("R.") at 127-30.) That application was denied on May 16, 2003, on the grounds that "[b]ased on a review of [Mr. Cosmas'] health problems[, he did] not qualify for benefits on [his] claim." (*Id.* at 98.) On June 26, 2003, Mr. Cosmas filed a request for consideration. (*Id.* at 103.) That request was denied on November 17, 2003. (*Id*. at 104-06.)

On December 2, 2003, Mr. Cosmas filed a request for hearing by an administrative law judge, stating that he "continue[d] to be disabled and fe[lt] that [he was] unable to perform any type of substantial, gainful activity on a sustained basis." (*Id.* at 107.)

Mr. Cosmas was granted a hearing on July 8, 2002 before Administrative Law Judge Richard De Steno ("De Steno" or "ALJ"). (*Id*. at 267-89.)  On September 23, 2005, ALJ De Steno denied Mr. Cosmas' request for a period of disability or Disability Insurance Benefits under sections 216(i) and 223 of the Social Security Act.  (*Id*. at 14-23.)   On January 26, 2006, the Administrative Appeals Judge denied Plaintiff's request for a review of the ALJ's decision. (*Id*. at 8-10.) The ALJ's decision thus became the final decision of the Commissioner.  (*Id.* at 8.) Mr. Cosmas subsequently sought review of the denial of benefits by this Court.

      B.      **Non-Medical History**

From 1995 through November 2000, plaintiff was employed as Comptroller for Tri-State Environmental Contracting ("Tri-State"), a company partially owned by his wife. (R. at 272.) Prior to that time, Mr. Cosmas was employed as Comptroller for a record company, London Records. (*Id*. at 274.)  Mr. Cosmas claims that he was paid $1,800 per week for his work as the Tri-State Comptroller.  (*Id*. at 78.)  Mr. Cosmas testified that after he fell ill, his wife took over his duties at Tri-State.  (*Id*. at 77.)  Mr. Cosmas indicated, however, that he was paid $121,900 in 2001.  (*Id*. at 38.)  In 2002 and 2003, Mr. Cosmas received $200 a week from Tri-State, through his wife, for "past services" to Tri-State.  (*Id*. at 38, 277.)

Mr. Cosmas claims that his duties at Tri-State included supervising staff members, reviewing financial reports and coordinating employees.  (*Id*. at 159-60)  Mr. Cosmas was responsible for hiring and firing employees, and was a "lead worker." (*Id*. at 159.)  Mr. Cosmas

alleges that his job required him to walk two hours a day, stand for two hours a day and sit for four hours a day. (*Id*. at 159.) Mr. Cosmas frequently lifted less than 10 lbs while at Tri-State. (*Id*.) Mr. Cosmas contends that even after his departure from Tri-State he discussed certain business events such as hiring and contract decisions with his wife. (*Id*. at 77.)

Mr. Cosmas claims that his activities are now limited as a result of his illness. (*Id*. at 278-79.) He claims to have difficulty getting dressed in the morning. (*Id*. at 279.) He contends that he has no more ambition, and no longer has his "vibrant" personality of old. (*Id*.) He performs household chores, but only "[a]s little as possible to get by." (*Id*. at 281.) He gets up at 11 a.m., eats breakfast, and lays down and watches television until his son comes back from school. (*Id*.) He drives very little and goes to the mall "once in awhile." (*Id*. at 281-82.) He claims to only be able to walk about half a mile. (*Id*. at 282.) He is also capable of doing some gardening, taking out the trash and changing light bulbs. (*Id*. at 162.) He claims to be "depressed." (*Id*. at 280, 283.)

    **C.**    **Medical History**

On May 19, 2000, Mr. Cosmas was treated for a perirectal abscess. (R. 183.) The abscess was drained by a "radial incision . . . extending from the perianal tissues laterally." (*Id*. at 183.) That procedure was unsuccessful. On December 7, 2000 Dr. Lawrence Jordan treated Mr. Cosmas for an anal fistula. (*Id*. at 184.) The anal fistula treatment did not appear to be successful either. In treating Mr. Cosmas, Dr. Jordan noted a right groin mass looking like dermafibrosarcoma protuberans. (*Id*.) He notified Dr. Simon Murray of this development by letter dated December 13, 2000. (*Id*.) On December 19, 2000, the diagnosis of dermafibrosarcoma protuberans was confirmed by Dr. James Woodruff. (*Id*. at 186.)

Dr. Eugene Salvati first ausculted Mr. Cosmas on January 9, 2001.  (*Id*. at 224.)  On May 29, 2001, Dr. Salvati performed surgery on Mr. Cosmas's anal fistula.  (*Id*. at 172.)  Mr. Salvati was Mr. Cosmas' treating colon and rectal surgeon until January 6, 2003.  (Def. Opp'n at 3.)

On January 29, 2001, Dr. James Goydos performed surgery on Mr. Cosmas' dermafibrosarcoma protuberans of the right groin.  (R. at 188.)  The procedure consisted of a wide excision of the sarcoma, with flap closure. (*Id*. at 195.)   Mr. Cosmas apparently tolerated the procedure well.  (*Id*. at 190.)  On May 2, 2001, Mr. Cosmas returned to Dr. Goydos for his three months follow-up examination.  (*Id*. at 208.)  Dr. Goydos indicated that Mr. Cosmas was in physical therapy, but felt well and had no complaint of generalized or specific pain.  (*Id*.)  The doctor also noted that while the patient had "some fatigue," he was "able to perform routine walking for short periods without overexertion on the extremity."  (*Id*. at 208-09.)

On May 29, 2001, Dr. Salvati performed further surgery on Mr. Cosmas in connection with his transsphincteric fistula.  (*Id*. at 226.)  Dr. Salvati indicated on June 25, 2001 that the patient was "completely healed," and was "very pleased with his result."  (*Id*. at 221.)  On August 15, 2001, Dr. Goydos noted that Mr. Cosmas had been "doing well" and was "in good spirits." (*Id*. at 206.)  After a physical examination, the doctor concluded that Mr. Cosmas was a "well-nourished, well-developed, adult white male who appears in no acute distress." (*Id.*)  The doctor noted that "the flap ha[d] healed quite well with no signs of palpable abnormalities or signs of recurrence." (*Id.*)

On November 12, 2001, Dr. Goydos once again examined Mr. Cosmas.  He indicated that Mr. Cosmas "ha[d] had some discomfort in the flap since the operation but this ha[d] been getting better over time."  (*Id*. at 203.)  "The patient ha[d] no clinical and most likely no

4

radiologic signs of recurrence of his relatively large though low grade dermatofibrosarcoma protuberans." (*Id*. at 204.)

On February 15, 2002, Dr. Goydos examined Mr. Cosmas for his "routine six-month follow-up examination." (*Id*. at 199.) After subjecting Mr. Cosmas to a Magnetic Resonance Imaging scan and a physical examination, Dr. Goydos found Mr. Cosmas to be "doing well from the aspect of his sarcoma." (*Id*. at 200.)

Doctor Goydos noted on August 19, 2002 that "[t]he patient had some postop[erative] complications with his flap and the flap was redone by Dr. Borah; however, since his final healing of his operative site he has been without evidence or progression of occurrence of his disease." (*Id*. at 195.) At that time, Dr. Goydos noted that Mr. Cosmas had "no complaint of generalized or specific pain," "denie[d] any headaches or visual changes," and "denie[d] any shortness or breath, coughing, wheezing, chest tightness . . . chest pain or palpitations." (*Id*.) His appetite was deemed good, his weight stable. (*Id*.) Overall, Dr. Goydos estimated that Mr. Cosmas was "alert, oriented, and cooperative," although "somewhat anxious . . . and apprehensive, but in no acute distress." (*Id*. at 196.)

On October 10, 2002, Dr. Murray wrote an open letter indicating that his patient, Mr. Cosmas, "ha[d] suffered greatly during the past year because of severe stresses in his life . . . ." (*Id*. at 51.) Dr. Murray added that Mr. Cosmas was "unable to work and it [was] unlikely that he [would] ever be able to work." (*Id*.) Dr. Murray concluded: "[i]n my opinion, the patient should be on permanent disability." (*Id*.)

On February 15, 2003, Dr. Murray offered his report on Mr. Cosmas to the State of New Jersey Department of Labor, Division of Disability Determination Services. (*Id*. at 230.) He

5

described Mr. Cosmas as an "interesting and difficult person" who "can not [sic] work because of his age and because of stress related to commuting to Jersey City." (*Id*.)  Dr. Murray reported that Mr. Cosmas was "unable to work the whole day," "tired easily," and felt that the commute wore him down.  (*Id*.)  Dr. Murray noted that the patient "probably could sit for four hours, but . . . could not lift or carry anything above 25 pounds." (*Id.* at 231.) Dr. Murray added that Mr. Cosmas could not stand or walk "for any length of time" and could not "push or pull for any length of time." (*Id*.)  Dr. Murray also alluded to Mr. Cosmas' possible mental problems, reporting that the "patient is quite anxious and irritable and it is my opinion that he perhaps has bipolar disease." (*Id*.)

On March 21, 2003, Dr. Sabat Bokhari examined Mr. Cosmas.  (*Id.* at 232.) Dr. Bokhari noted that Mr. Cosmas was "very upset" after his string of surgeries, and that he felt "stressed and depressed." (*Id*.)  Mr. Cosmas denied "any suicidal or homicidal ideation." (*Id*.) Dr. Bokhari also noted that Mr. Cosmas had a normal gait, was oriented times three, and had motor capability measured as 5 out of 5.  (*Id.* at 233.)

On March 22, 2003, Mr. Cosmas was given a mental status examination by Dr. Alan Gordon.  (*Id.* at 234.)  Mr. Cosmas told Dr. Gordon that he was "bored and tired," and did not want to do anything.  (*Id*. at 235.)  Mr. Cosmas also told him that he did not socialize much. (*Id*. at 236.)  Mr. Cosmas was "oriented to time, place and person." (*Id*.)  He was able to complete serial sevens on five occasions starting from one hundred without making an error.  (*Id*.)  "There was no evidence of any thought disorder." (*Id*.)  Dr. Gordon noted that "[w]hen discussing depression, he stated that he [was] depressed, but not suicidal." (*Id*.) Mr. Cosmas informed Dr. Gordon that he could not sit still, was easily irritated and had no patience.  (*Id*.)  Mr. Cosmas was

able to recall three out of three items after five minutes elapsed. (*Id.*) Dr. Gordon diagnosed Mr. Cosmas with a depressive disorder, not otherwise specified. (*Id.* at 237.)

In April 2003, Dr. Liarena, a State Agency doctor, examined Mr. Cosmas. (*Id.* at 238.) Dr. Liarena reported that Mr. Cosmas could occasionally lift 20 pounds, and could frequently lift 10 pounds. (*Id.* at 239.) Dr. Liarena also found that Mr. Cosmas could stand at least 2 hours in an 8 hour workday, and could sit for about 6 hours. (*Id.*) The doctor also noted that Mr. Cosmas had no manipulative, visual, postural, communicative or environmental limitations. (*Id.* at 240-42.)

In May 2003, Dr. Joseph Wieliczko reported that while Mr. Cosmas had an affective disorder (depression - not otherwise specified), he was not severely medically impaired. (*Id.* at 246, 49.) Dr. Wieliczko noted that Mr. Cosmas suffered mild restrictions on the activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence and pace. (*Id.* at 256.) Dr. Wieliczko added that Mr. Cosmas suffered no episodes of decompensation. (*Id.*)

## II. DISCUSSION

### A. Standard of Review for Social Security Appeals

The Commissioner's decisions as to questions of fact are conclusive before a reviewing court if they are supported by "substantial evidence" in the record. 42 U.S.C. § 405(g); *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotations omitted). If the ALJ's findings of fact are supported by substantial evidence, this Court is bound by those findings, "even if [it]

would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) (citation omitted).

The Third Circuit Court of Appeals has made it clear "that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) (emphasis in original). The ALJ must analyze all the evidence and explain the weight he has given to probative exhibits. *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978). The Third Circuit Court of Appeals has held that access to the ALJ's reasoning is indeed essential to a meaningful court review. *Fargnoli,* 247 F.3d at 42. Nevertheless, the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan,* 970 F.2d 1178, 1182 (3d Cir. 1992) (citation omitted).

   **B. Application**

Mr. Cosmas argues that ALJ De Steno erred in finding that he could resume past work and was therefore not eligible for disability benefits. This Court disagrees.

A claimant may not receive benefits under the Act unless he or she first meets statutory insured status requirements. A claimant must be disabled, which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). An individual is not under a disability unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

Regulations promulgated under the Act establish a five-step process for an ALJ's evaluation of a claimant's disability. 20 C.F.R. § 404.1520. In the first step, the ALJ must determine whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is working and the work is a substantial gainful activity, his application for disability benefits is automatically denied. *Id.* If the claimant is not employed, the ALJ proceeds to step two and determines whether the claimant has a severe impairment or a combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). A claimant who does not have a severe impairment is not disabled. *Id.* Third, if the impairment is found to be severe, the ALJ determines whether the impairment meets or is equal to those impairments listed in Appendix 1, Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is conclusively presumed to be disabled, and the evaluation ends. 20 C.F.R. § 404.1520(d). The third step must be more than a conclusory statement – the ALJ must discuss the evidence presented and include an analysis of whether and why the claimant's impairments, or those impairments combined, are or are not equivalent in severity to one of the listed impairments. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000).

If it is determined that the impairments do not meet or equal a listed impairment, the ALJ proceeds to step four, which requires a determination of: (1) the claimant's capabilities despite limitations imposed by an impairment (i.e., residual functional capacity, or RFC); and (2)

whether those limitations prevent the claimant from returning to work performed in the past. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant is found capable of performing his previous work, the claimant is not disabled. *Id.* If the claimant is no longer able to perform his prior line of work, the evaluation must continue to the last step. The fifth step requires a determination of whether the claimant is capable of adjusting to other work available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ must consider the claimant's RFC, together with his age, education, and past work experience. 20 C.F.R. § 404.1520(g). Thus, entitlement to benefits turns on a finding that the claimant is incapable of performing his past work or some other type of work in the national economy because of his impairments.

The application of these standards involves shifting burdens of proof. The claimant has the burden of demonstrating both steps one and two, i.e., an absence of present employment and the existence of a medically severe impairment. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant is unable to meet this burden, the process ends, and the claimant does not receive benefits. *Id.* If the claimant carries the burden and demonstrates that the impairments meet or equal those within the Listing, he satisfies his burden of proof and is automatically entitled to benefits. *Id.* If the claimant is not conclusively disabled under the criteria set forth in the Listing, step three is not satisfied, and the claimant must prove "at step four that the impairment prevents him from performing his past work." *Id.* Thus, it is the claimant's duty to offer evidence of the physical and mental demands of past work and explain why he is unable to perform such work. If the claimant meets this burden, the burden of proof then shifts to the Commissioner to show, at step five, that the claimant is "able to perform work available in the national economy." *Id.* The step five analysis "can be quite fact specific." *Burnett*, 220 F.3d at

126.

In the case at bar, Judge De Steno correctly noted that "[i]n order to determine whether [Mr. Costas] is disabled, a five-step evaluation must be performed pursuant to 20 C.F.R. § 404.1520." R. 18. As a threshold matter, the Judge found that the claimant had not engaged in substantial gainful activity "from November 15, 2000 to March 9, 2005." *Id*. Neither party disputes this assertion.

Proceeding to step two of the analysis, Judge De Steno noted that "[a] medically determinable impairment or combination of impairments is 'severe' if it significantly limits an individual physical or mental ability to do basic work activities." *Id*., *citing* 20 C.F.R. § 404.1520. Judge De Steno acknowledged that Mr. Cosmas's medical evidence, including the extensive descriptions of his "history of sarcomas of the groin and the residual effects of corrective surgeries," established that his impairment was "severe" under the regulations. R. at 18.

Reaching step three of the analysis, however, Judge De Steno ruled that neither Mr. Cosmas' physical nor mental impairments were "severe enough to meet or medically equal, either singly or in combination, any of the impairments listed in Appendix 1, Subpart P [of 20 C.F.R. § 404]." *Id*. Proceeding to step four of the analysis, the judge inquired "whether the claimant retain[ed] the residual functional capacity to perform the requirements of his past relevant work or other work existing in significant numbers in the national economy." *Id*. In reviewing Mr. Cosmas' alleged physical impairment, the Judge concluded that:

> the claimant's residual functional capacity, from November 5, 2000 to March 9, 2005, limited him to work involving lifting and carrying objects weighing up to 10 pounds, sitting up to six hours,

>and standing and walking up to two hours in an eight-hour day; and
the full range of sedentary work.  The claimant has not had any
significant non-exertional limitations.

*Id*. at 20-21.  As for Mr. Cosmas' alleged mental impairment, the ALJ ruled that "the balance of the mental status examination was normal," and that "the evidence fail[ed] to establish a mental impairment that had any greater than a slight or minimal effect on the claimant's ability to perform basic mental work-related activities . . . ." *Id*. at 21.  Judge De Steno concluded that "the claimant could return to his past relevant work as a controller-treasurer, as the job is generally performed in the national economy." *Id*. at 22.

Plaintiff claims that Judge De Steno's ruling should be overturned on two grounds.  First, Plaintiff argues that the ALJ's decision that Plaintiff could resume past work – and is therefore ineligible for disability benefits – is not supported by substantial evidence.  Pl. Br. at 18.  Second, Plaintiff claims that Judge De Steno "inappropriately dismissed the opinion of plaintiff's treating physician," Dr. Murray.  *Id*. at 11.  The Court will address each contention in turn.

### 1. The ALJ's Decision is Supported by Substantial Evidence.

Plaintiff takes exception to the ALJ's ruling, arguing that "there is no evidentiary reason" for the ALJ's conclusion that Mr. Cosmas is not disabled under the regulations.  Pl. Br. at 9.

First, Plaintiff points to the reports of Dr. Gordon, Dr. Bokhari and Dr. Murray – all of whom appear to conclude that Mr. Cosmas suffered from depression – as proof that Mr. Cosmas is mentally disabled.  Plaintiff alleges that the ALJ's decision to deny Mr. Cosmas' disability claim was thus reached in contravention of controlling evidence of disability in the record.  Pl. Br. at 17.

In addition, Plaintiff claims that the ALJ failed to describe his residual functional capacity

"in terms of specific work limitations and/or capabilities on a 'function by function basis.'" *Id*. at 20 ("In the instant case, no 'task by task' evaluation of plaintiff's past work and his physical and mental capabilities was undertaken."). Had the ALJ done so, Plaintiff alleges, he would have been compelled to find that Mr. Cosmas is disabled and unable to perform his duties as a comptroller. Plaintiff contends that the ALJ's opinion must, under the circumstances, be deemed inadequate.

Defendant responds by arguing that the evidence considered by the ALJ fully supports the ALJ's determination that plaintiff had the residual functional capacity for a full range of sedentary work. Def. Opp'n at 10. Defendant in particular highlights that Dr. Goydos "repeatedly noted that after plaintiff's surgery to remove the sarcoma of his right groin plaintiff showed no evidence of recurrence of the sarcoma," *id.*, a diagnosis that was later confirmed by Dr. Salvati. *Id.* at 11. Defendant also notes that Dr. Bokhari found Plaintiff's gait and range of motion to be normal, his lungs to be clear, and found that Mr. Cosmas did not suffer from muscle atrophy. *Id*. Moreover, Defendant argues that Dr. Liarena's report establishes that Plaintiff can "occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk at least two hours in an eight-hours in an eight-hour workday, sit about six hours in an eight-hour workday, and had unlimited pushing and/or pulling ability," an assessment that is "consistent with one's ability to perform light work." *Id*.

Finally, Defendant claims that the evidence presented to the ALJ regarding Mr. Cosmas' alleged mental impairments was consistent with the ALJ's ultimate denial of Mr. Cosmas' request for benefits. Defendant argues that "the ALJ properly found that plaintiff's mental impairment was nonsevere because there was no medical evidence that plaintiff's symptoms had

13

more than a minimal effect on plaintiff's physical or mental ability to perform basic work activities . . . ." *Id*. at 12.  In particular, Defendant highlights the fact that the ALJ took into consideration Dr. Gordon's and Dr. Wieliczko's assessments that any impairments suffered by Mr. Cosmas as a result of his mental condition were "benign" or "mild."  *Id*. at 13-14.

This Court finds that Judge De Steno based his opinion on substantial evidence, and produced a reasoned and well-researched opinion in denying Mr. Cosmas' request for disability benefits.  *See Plummer*, 186 F.3d at 427 (substantial evidence means such relevant evidence as a reasonable mind might accept as adequate).   The Court notes that Judge De Steno explained at step three of the disability analysis that "[n]o treating or consultative physician ha[d] mentioned findings equivalent in severity to the criteria of any . . . impairment" "listed in Appendix 1, Subpart P [of 20 C.F.R. § 404]."  R. at 18.  Judge De Steno specified that this analysis had been applied both in connection with Mr. Cosmas' alleged physical impairment ("[p]articular attention was given to the numerous types of cancer described in section 13.00 of the medical listings relating to malignant neoplasms . . . ."), and in connection with his alleged mental impairment.  *Id.*

Judge De Steno examined in painstaking detail Mr. Cosmas' lengthy medical history – including accounts by Drs. Goydos, Salvati and Murray establishing that there was no sign of recurrence of Mr. Cosmas' sarcoma and that Mr. Cosmas no longer suffered as a result of his surgeries – to assess whether Mr. Cosmas was physically impaired.  *Id*. at 19.  Judge De Steno also very carefully outlined the work requirements of the Comptroller position, as the job is

14

generally performed in the national economy,[1] and compared them with Dr. Liarena's evaluation of the claimant's residual functional capacity. *Compare id*. at 20-21 ("work involving lifting and carrying objects weighing up to 10 pounds, sitting up to six hours, and standing and walking up to two hours in an eight-hour day; and the full range of sedentary work."), *with id.* at 239.

It thus appears beyond contention to this Court that Judge De Steno based his finding that Mr. Cosmas' physical condition did not amount to a physical impairment under the regulations on substantial evidence. As will be discussed further below, the presence in the record of a single medical opinion to the contrary (the opinion of Dr. Murray), does not render Judge De Steno's ruling baseless.

Judge De Steno's ruling on Mr. Cosmas' alleged *mental* impairment was also made on

---

[1] The Dictionary of Occupational Titles states, in relevant part:

> 161.117-018 TREASURER (profess. & kin.) alternate titles: treasury representative
> Directs financial planning, procurement, and investment of funds for an organization: Delegates authority for receipt, disbursement, banking, protection and custody of funds, securities, and financial instruments. Analyzes financial records to forecast future financial position and budget requirements. Evaluates need for procurement of funds and investment of surplus. Advises management on investments and loans for short- and long-range financial plans. Prepares financial reports for management. Develops policies and procedures for account collections and extension of credit to customers. Signs notes of indebtedness as approved by management. May act as CONTROLLER (profess. & kin.) 160.167-058.
> GOE: 11.06.03 STRENGTH: S GED: R5 M5 L5 SVP: 8
> DLU: 77.

United States Dept. of Labor, Dictionary of Occupational Titles, Code 161.117-018 (4th ed. 1991).

the basis of substantial evidence in the record.  The ALJ focused on the report of Dr. Gordon, and noted that while "Dr. Gordon diagnosed a depressive disorder," *id*. at 21, "the balance of the mental status examination was normal, since the claimant was oriented in three spheres, his speech was intact, he had good judgment and he was not suicidal."  *Id.*  The ALJ also noted that under the regulations' Listing of Impairments, Mr. Cosmas could not be deemed to have significant non-exertional limitations.  *Id*.  Judge De Steno noted in particular that this conclusion was mandated by Mr. Cosmas' admission to Dr. Gordon that "he watched television, walked to shopping malls, . . . read periodicals, drove his son to various places, paid bills, performed some household chores and did the shopping."  *Id*.  This evidence, combined with the evidence of Mr. Cosmas' ability to perform serial seven subtractions, his ability to complete basic memory exercises and the lack of decompensation episodes in his medical history, reasonably led to the ALJ's holding that the "evidence fail[ed] to establish a mental impairment that had any greater than a slight or minimal effect on the claimant's ability to perform basic mental work-related activities . . . ."  *Id*.

For the foregoing reasons, this Court finds that Judge De Steno's denial of Mr. Cosmas' request for disability benefits was based on substantial evidence.

### 2. The Administrative Law Judge Gave Sufficient Weight to Dr. Murray's Opinion.

Plaintiff also claims that Judge De Steno deliberately failed to give any weight to Dr. Murray's report to the Social Security Administration, in which the doctor stated:

> The patient owns his own business and is unable to work the whole day because of fatigue.  He probably could sit for four hours but he could not lift or carry anything above twenty-five pounds.  He could not stand or walk for any length of time.  He cannot push or

16

> pull for any length of time. The patient is limited in part by his
> physical problems but also by mental problems. The patient is
> quite anxious and irritable and it is my opinion that he perhaps has
> bipolar disease. I have suggested to him that he see a psychiatrist
> on several occasions but due to the nature [sic] and volatile nature
> of his psychiatric illness, I believe he is disabled on that basis as
> well.

Pl. Br. at 11-12, *citing* R. 230-31. Plaintiff argues that Judge De Steno's decision should therefore be overturned. This Court disagrees.

Setting aside Plaintiff's repeated aspersions on Judge De Steno's integrity,[2] this Court notes that Plaintiff essentially claims: (i) that the ALJ failed to specify any part of the record that contradicts Dr. Murray's assessment of Mr. Cosmas, (ii) that the ALJ failed to properly challenge Dr. Murray's opinion, and (iii) that the ALJ offered no evidence to substantiate its claim that Dr. Murray's opinion of disability "is founded only upon the self-reported symptoms of fatigue made by the claimant." Pl. Br. at 14. Plaintiff claims in particular that the ALJ improperly relied on SSR 96-5P, which states that:

> Medical sources often offer opinions about whether an individual
> who has applied for title II or title XVI disability benefits is
> "disabled" or "unable to work," or make similar statements of
> opinions. In addition, they sometimes offer opinions in other
> work-related terms; for example, about an individual's ability to do
> past relevant work or any other type of work. Because these are
> administrative findings that may determine whether an individual

---

[2] *See, e.g.*, Pl. Br. at 9 ("the ALJ contrived to arrange the evidence in a distorted fashion in order to achieve a predetermined result."); *id.* at 12 ("ALJ Desteno [sic], no novice in the evidence nullification business . . . ."); *id*. at 14 ("The ALJ doesn't tell us because this ALJ never tells us. In the evidence nullification business, specifics can be troublesome."); *id*. ("Where in the record 'as a whole' does the ALJ find contradictory findings which would tend to detract from the findings advanced by Dr. Murray? Again, no specifics. ALJ Desteno is almost as famous for doing this on a regular as this Court is for allowing it.").

17

> is disabled, they are reserved to the Commissioner. *Such opinions*
> *on these issues must not be disregarded. However, even when*
> *offered by a treating source, they can never be entitled to*
> *controlling weight or given special significance.*

SSR 96-5P, *Policy Interpretation Ruling Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner* (emphasis added).

Defendants respond that Judge De Steno acknowledged the contents of Dr. Murray's report, but correctly chose not to give them much probative weight on the grounds that the evaluation was based on Mr. Cosmas's subjective complaints, rather than any objective evaluation of the patient, and that the report's finding that Mr. Cosmas was unable to sit for four hours, stand walk, push or pull for any length of time, and the "functional limitations described by Dr. Murray were not consistent with the record as a whole. Def. Opp'n at 14-16.

This Court finds that Judge De Steno did not improperly disregard Dr. Murray's opinion, as Dr. Murray's assessment of Mr. Cosmas' alleged physical and mental disabilities was indeed "not supported by any of his own objective clinical findings or the record as a whole." Dr. Murray's opinion of disability was founded only upon the self-reported symptoms of fatigue made by Mr. Cosmas and was therefore reasonably deemed less trustworthy by the ALJ.

For the foregoing reasons, and in light of the guideline provided in SSR 96-5P, this Court finds that Judge De Steno did not improperly disregard Dr. Murray's opinion.

### III. CONCLUSION

The Court thus finds that Judge De Steno's opinion was substantially supported by evidence in the record, and finds that the ALJ gave sufficient weight to Dr. Murray's opinion. This Court will therefore affirm Judge De Steno's decision to deny Mr. Cosmas the disability benefits he seeks. An appropriate form of Order accompanies this Opinion.

Dated February 6, 2007

                                                 s/ Garrett E. Brown, Jr.
                                              GARRETT E. BROWN, JR., U.S.D.J.